**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **BRENDA ANDERSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CAUSE NO. 1:09-CV-00327** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Brenda Anderson appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Anderson applied for DIB and SSI on January 11, 2005, alleging that she became disabled as of October 1, 2003.[2] (Tr. 15, 79-85.) The Commissioner denied her application initially and upon reconsideration, and Anderson requested an administrative hearing. (Tr. 45-47, 52-57, 60-69.) A hearing was conducted by Administrative Law Judge ("ALJ") Yvonne Stam on October 10, 2007, at which Anderson (who was represented by counsel), her sister, and a vocational expert ("VE") testified. (Tr. 533-59.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Apparently, Anderson had also filed DIB and SSI applications previously. (*See* Tr. 79, 81.)

On April 8, 2008, the ALJ rendered an unfavorable decision to Anderson, concluding that she was not disabled because she could perform her past relevant work as a hand packager. (Tr. 12-25.) The Appeals Council denied Anderson's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-4.) Anderson filed a complaint with this Court on November 24, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. ANDERSON'S ARGUMENTS

Anderson alleges two flaws with the Commissioner's final decision. Specifically, Anderson claims that the ALJ (1) failed to incorporate all of her mental limitations into the residual functional capacity ("RFC")[3] and into her questioning of the VE at step four, and (2) improperly evaluated the opinion of Galen Yordy, Ph.D., an examining psychologist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 13-17.)

## III. FACTUAL BACKGROUND[4]

### A. Background

At the time of the ALJ's decision, Anderson was forty-eight years old, had a high school education, and had completed cosmetology training. (Tr. 79, 185.) She possessed past relevant work experience as a childcare provider (1996 through 1999) and a hand packager (2003). (Tr. 95, 138-39.) Anderson alleges that she became disabled as of October 1, 2003, due to musculoskeletal complaints, including aches and pains of the back and knees; major depressive

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

[4] In the interest of brevity, this Opinion recounts only the portions of the 559-page administrative record necessary to the decision.

disorder, single episode, chronic, severe with psychotic features; anxiety disorder, NOS; panic disorder without agoraphobia; and personality disorder, NOS. (Opening Br. 2.) Anderson does not challenge the findings of the ALJ in regard to her physical condition. (Opening Br. 3 n.2.) Therefore, the Court will focus on the evidence pertaining to Anderson's mental limitations.

### B. Anderson's Testimony at the Hearing

At the hearing, Anderson testified that she recently had been approved for Section 8 housing and thus had moved from her mother's home into her own apartment. (Tr. 544.) She has one adult son. (Tr. 548.) She stated that she had received mental health treatment several years earlier but stopped in June 2003 when she moved in with her mother, because her mother did not want her to attend any longer. (Tr. 547.) Anderson explained that she moved in with her mother because she "wasn't stable then" and she and her son "ha[d] nowhere else to go." (Tr. 548, 550.) When asked why she could not return to her most recent job as a packer, she listed only various physical problems, such as right hand numbness, back problems, and problems with standing.

As to her psychological complaints, Anderson stated that she often hears voices of "friends that passed away." (Tr. 549.) She elaborated that she also sees "shadows" and hears sounds, such as music or sirens. (Tr. 549.) Anderson reported that these images and sounds disturb her sleep, explaining that it "seems like something is in the room with [her]." (Tr. 549-50.)

Anderson's sister, Ernastine, also testified at the hearing, essentially corroborating Anderson's testimony. (Tr. 551-56.) She relayed that Anderson was "very moody", "want[s] to stay to herself", and has problems getting along with people. (Tr. 552, 554.) She reported that she checks on Anderson every day, and about three times a week she has to help her with various

3

personal care tasks, such as dressing. (Tr. 553.) Ernastine also accompanies Anderson to appointments. (Tr. 553.)

*C. Summary of the Relevant Medical Evidence Prior to Anderson's Alleged Onset Date*

In June 1999, Anderson was evaluated by Kenneth Bundza, Ph.D. (Tr. 525-28.) Her grooming and hygiene were good, but she had a tearful affect throughout the evaluation. (Tr. 526.) Dr. Bundza concluded that she possibly had cognitive/intellectual deficits and that she was functioning, at best, in the borderline range of intellectual functioning. (Tr. 527.) He thought she presented with major depression, recurrent, severe, without psychotic features. (Tr. 526.) He noted that she currently was not involved in treatment and, as a result, her prognosis appeared poor. (Tr. 527.) He assigned her a Global Assessment of Functioning ("GAF") score of 40 (major impairment).[5]

In September 2001, Anderson was hospitalized at Parkview Behavioral Health after a suicide attempt. (Tr. 496-98.) Dr. Nilda Salazar performed a psychiatric exam. (Tr. 496-98.) Anderson reported loss of appetite and disrupted sleep but denied current suicidal or homicidal thoughts. (Tr. 496.) She admitted to using marijuana for years; drinking alcohol; taking diet pills, prescription narcotics, and illegal drugs; and in the past, inhaling paint thinner and hair spray; she clarified, however, that she had greatly minimized her current drug use. (Tr. 496.)

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

She was assigned a GAF of 45 (serious impairment) and diagnosed with polysubstance dependance, substance abuse, mood disorder, and personality disorder, NOS. (Tr. 497.)

In February 2002, Anderson was seen at Park Center and was diagnosed with polysubstance dependence, substance-induced mood disorder, and post-traumatic shock syndrome. (Tr. 433.) She was assigned a current GAF of 49 (serious impairment). (Tr. 433.)

In April 2002, Susan Rudolph, Ph.D., performed a psychological evaluation of Anderson at the request of Social Security. (Tr. 491-95.) Anderson admitted that she occasionally has thoughts of suicide, "sees someone standing in the room", and hears voices telling her to do bad things. (Tr. 491-92.) Dr. Rudolph noted that her appearance and grooming were appropriate. (Tr. 491-92.) She appeared to have limited energy and to be depressed and discouraged; she presented with a sad, flat, and anxious affect. (Tr. 491-93.) Dr. Rudolph noted that she appeared to have difficulty with concentration and focusing on a task. (Tr. 493.) She opined that Anderson could not attend to a simple, repetitive task, continuously for a two-hour period because of her inability to sit and stand, numbness in her arms, and pain in her foot, as well as her inability to concentrate and remember what she is doing. (Tr. 295.) She rated her current and past GAF at 55 (moderate impairment) and diagnosed her with major depression with anxiety and panic attacks; and dependant personality disorder, situational. (Tr. 295.)

D. *Summary of the Relevant Medical Evidence After Anderson's Alleged Onset Date*

Anderson was hospitalized for five days in April 2004 at Parkview Behavioral Health, complaining that she was depressed, suicidal, and hearing voices. (Tr. 457-58.) She stated that the voices sometimes tell her to hurt herself and other people. (Tr. 457.) She also reported that she had been drinking alcohol, using marijuana "too much", and had started using cocaine "all

5

day and all night"; she tested positive for cocaine, marijuana, and benzodiazepines. (Tr. 457-58.) On mental status exam, Anderson was tearful; she demonstrated some insight into her problems but her judgment was poor. (Tr. 458.) She was diagnosed with major depressive disorder, severe with psychotic features; cannabis dependence; polysubstance abuse with abuse of marijuana, opioids, benzodiazepines, and cocaine; and personality disorder, NOS; with a rule-out diagnosis of substance-induced mood and thought disorder. (Tr. 458.) Upon discharge, Anderson stated that the voices "were pretty much gone" and that her mood and sleep were significantly better. (Tr. 459.) Upon discharge, the treating psychiatrist assessed that her prognosis "remains guarded due to significant history of substance abuse." (Tr. 459.) Her GAF was scored at 40 (major impairment) upon admission and 50 (serious impairment) upon discharge. (Tr. 458.)

In June 2004, Park Center created a treatment plan for Anderson, which involved a structured outpatient program for her polysubstance abuse dependence and major depression, severe. (Tr. 421-23.) Her current GAF was scored at 42 (serious impairment). (Tr. 421-23.)

That same month, W. Shipley, Ph.D., a state agency psychologist, reviewed Anderson's record and found that she did not have a severe mental impairment. (Tr. 439.) Dr. Shipley opined:

> This claimant is diagnosed with major depression, severe with psychotic features; however, accompanying depressive symptoms is a long history of drug and alcohol use. ADLs indicate that the claimant is now clean and is doing quite well. She is capable of performing tasks as her physical condition allows. DA & A is not material at this time.

(Tr. 451.)

Two months later, in August 2004, Anderson was discharged from Park Center's program because her attendance was inconsistent, her progress was minimal while in treatment,

6

and she was noncompliant with medication reviews. (Tr. 419.)

In April 2005, Galen Yordy, Ph.D., performed a psychological evaluation at the request of the Social Security Administration. (Tr. 260-63.) Anderson was tearful throughout the interview; she reported hearing voices and having panic attacks and visual hallucinations. (Tr. 260-63.) On mental status exam, her dress and grooming were good and her use of language suggested average intelligence. (Tr. 260-63.) However, no hallucinations were evident in her behavior during the interview. (Tr. 260-63.) He diagnosed her with major depressive disorder, single episode, chronic, severe with psychotic features; anxiety, NOS; panic disorder without agoraphobia; cannabis dependence and sustained full remission; and rule out personality disorder, NOS. (Tr. 260-63.) He rated her current GAF at 45 (serious impairment). (Tr. 260-63.)

On April 11, 2005, Dr. H.M. Bacchus, performed a consultative examination of Anderson at the request of the Social Security Administration. (Tr. 264-67.) He found that many of her generalized musculoskeletal complaints may be psychologically related. (Tr. 266.)

That same month, B. Randal Horton, Ph.D., a state agency psychologist, reviewed Anderson's record and concluded that she was mildly limited in her daily living activities and social functioning; and moderately limited in her ability to maintain concentration, persistence, or pace. (Tr. 256.) More specifically, on his mental RFC assessment he found that she was not significantly limited in eighteen out of twenty mental functioning categories, but that she was moderately limited in her ability to perform activities within a schedule and maintain regular attendance, and in her ability to complete a normal workweek without interruptions from psychologically-based symptoms. (Tr. 234-35.) He noted that she was diagnosed with psychosis but that no psychosis was observed upon evaluation. (Tr. 234.) He also noted that she was on

7

antidepressants but that she was not participating in counseling, and that she could shop; perform her own personal care, light chores, and simple money management; prepare simple meals; use public transportation; and demonstrate fair comprehension. (Tr. 236.) He concluded that she was "partially credible" and that she retained the ability to perform simple, repetitive tasks. (Tr. 236.) A second state agency psychologist later affirmed Dr. Horton's opinion. (Tr. 236.)

On October 11, 2007, an intake evaluation was done at Park Center. (Tr. 215-20.) Anderson requested medication, complaining that she was hearing voices and having hallucinations. (Tr. 215.) The assessment reflected that her mood, insight, and judgment were normal and that her appearance and behavior were appropriate, but that she had problems with recent memory. (Tr. 218.) She was assigned a diagnosis of polysubstance abuse and schizophrenia, paranoid, chronic. (Tr. 218.) Her current GAF was rated at 42 (serious impairment). (Tr. 218.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

8

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative

9

answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. *The ALJ's Decision*

On April 8, 2008, the ALJ rendered her decision. (Tr. 12-25.) She found at step one of the five-step analysis that Anderson had not engaged in substantial gainful activity since her alleged onset date. (Tr. 17.) At step two, the ALJ concluded that Anderson had the following severe impairments: a bipolar disorder and musculoskeletal complaints, including aches and pains of the back and knees. (Tr. 17.)

At step three, the ALJ determined that Anderson's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 17.) Before proceeding to step four, the ALJ determined that Anderson's testimony of debilitating limitations was not credible and that she had the following RFC:

> [T]he claimant has the residual functional capacity to perform unskilled simple, repetitive tasks at a light exertional level of work . . . except that the claimant can only occasionally climb, balance, stoop, kneel, crouch or crawl.

(Tr. 19.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Anderson was able to perform her past relevant work as a hand packager. (Tr. 25.) Therefore, Anderson's claims for DIB and SSI were denied. (Tr. 25.)

*C. The ALJ Adequately Incorporated Anderson's Mental Limitations
into the RFC and into Her Questioning of the VE at Step Four*

Anderson first argues that the ALJ failed to include limitations in the RFC and the hypothetical question to the VE to adequately account for her finding that Anderson had moderate limitations in concentration, persistence, or pace. The RFC assigned by the ALJ and the hypothetical posed to the VE limited Anderson to "simple, repetitive tasks". Anderson now argues that, as a matter of law, a limitation to simple, repetitive tasks is not sufficient to account for moderate limitations in concentration, persistence, or pace. Anderson's argument ultimately fails to warrant a remand of the Commissioner's final decision.

In determining the severity of a claimant's mental impairment, the ALJ must address the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a; *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "[took] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, or pace); *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (same). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Kasarsky*, 335 F.3d at 543 (emphasis added); *see also Stewart*, 2009 WL 859830, at 684 ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported

11

by medical evidence in the record.").

Here, at step three of her analysis, the ALJ found that Anderson had mild limitations in activities of daily living and social functioning, and moderate limitations in maintaining concentration, persistence, or pace. Instead of specifically incorporating these findings into the RFC, the ALJ instead limited Anderson to "simple repetitive tasks". (Tr. 19.) In doing so, however, the ALJ relied upon the opinions of Dr. Horton and Dr. Neville, the state agency psychologists, who specifically opined that Anderson could perform "simple repetitive tasks." (Tr. 236.)

In that vein, courts have held that when a medical source of record translates specific mental health findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating her RFC.[6] *O'Connor-Spinner v. Astrue*, No. 4:06-CV-0171-DFH-WGH, 2007 WL 4556741, at *7 (S.D. Ind. Dec. 20, 2007). That is, "an ALJ is free to formulate [her] mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Id*. (quoting *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 56716, at *4 (W.D. Wis. Mar. 2, 2005) (internal quotation marks omitted)); *see Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could

---

[6] In support of her argument, Anderson cites *Stewart*, 561 F.3d at 684-85; *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008); and *Young v. Barnhart*, 362 F.3d 995, 1002-05 (7th Cir. 2004), for the broad proposition that a limitation to "simple, repetitive tasks" does not account for limitations in concentration, persistence, or pace. However, unlike the instant case, in these three suits there was no indication that a physician of record translated the claimant's deficits in concentration, persistence, or pace into a limitation of "simple, repetitive tasks."

12

still perform low-stress, repetitive work.").

Here, Dr. Horton and Dr. Neville, the state agency psychologists, acknowledged that Anderson had moderate limitations in maintaining concentration, persistence, or pace, but nonetheless concluded that she retains the ability to do simple, repetitive work. (Tr. 234-36.) Consequently, the ALJ adequately accounted for Anderson's deficits in concentration, persistence, or pace when she assigned an RFC limiting her to simple repetitive work, as supported by the opinion of the state agency psychologists. *See Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC limiting the claimant to simple, repetitive tasks, in part because the state agency psychologist assessed that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ's limitation of plaintiff to work that is "routine and low stress" as recommended by one medical source of record adequately accounted for the fact that plaintiff "often" suffers from deficiencies in "concentration, persistence, or pace").

Therefore, the RFC and the hypothetical the ALJ posed to the VE at step four were supported by substantial evidence, and Anderson's first argument in pursuit of a remand is unpersuasive.

D. *The ALJ's Consideration of Dr. Yordy's Opinion Is Supported by Substantial Evidence*

Anderson also contends that the ALJ improperly considered the opinion of Dr. Yordy, a consulting psychologist who evaluated her at the request of the Social Security Administration and assigned her a GAF of 45. Anderson's second argument also fails to warrant a remand of the

13

Commissioner's final decision.

The Commissioner must "evaluate every medical opinion [it] receive[s]." 20 C.F.R. §§ 404.1527(d), 416.927(d). Each medical opinion, other than a treating physician's opinion that is entitled to controlling weight, must be evaluated pursuant to the following factors in order to determine the proper weight to apply to it: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d), 416.927(d); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005); *Windus v. Barnhart*, 345 F. Supp. 2d 928, 939-43 (E.D. Wis. 2004); *Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1031-32 (E.D. Wis. 2004).

Here, the ALJ did indeed discuss Dr. Yordy's opinion, penning an entire paragraph on the matter. (Tr. 23-24.) Consistent with 20 C.F.R. §§ 404.1527(d) and 416.927(d), the ALJ acknowledged that Dr. Yordy was a consulting state agency psychologist who evaluated Anderson one time in April 2005. (Tr. 23.) She then recited several of the findings from Dr. Yordy's evaluation, including the diagnoses and GAF score he assigned to Anderson, her problems with concentration and memory; her subjective report of hallucinations; and her lack of any physical peculiarities or behavioral oddities. (Tr. 23.)

In doing so, the ALJ chose to discount Dr. Yordy's opinion. She explained that although Dr. Yordy included "psychotic features" in Anderson's diagnosis of depression, this was based on Anderson's subjective report of symptoms, as Dr. Yordy stated that "[h]er reported hallucinations

14

were not evident in her behavior." (Tr. 24.) She also noted that while Dr. Yordy observed some problems with memory and concentration, Anderson had no difficulty in recalling her basic activities from the previous day. (Tr. 24.) And finally, the ALJ decided to assign "little weight" to Dr. Yordy's GAF score of 45, explaining that "it represents a snapshot only." (Tr. 24.) Thus, the ALJ did indeed sufficiently document her reasoning concerning Dr. Yordy's opinion.

Anderson, however, criticizes the ALJ's rationale for discounting the opinion. She contends that Dr. Yordy took a thorough history from her, administered a mental status exam, and reviewed the discharge summary from her April 2004 hospitalization, and thus his opinion indeed has ample clinical support. Specifically, she points out that her April 2004 discharge summary, which Dr. Yordy received, reflects that she has reported hearing voices for a long time. She also contends that most of the other mental health professionals of record also assigned her a GAF score indicative of a "serious" impairment, and thus that Dr. Yordy's score of 45 is more than just a "snapshot" of her impairment.

Anderson's attempt to "nitpick" the ALJ's reasoning, *see Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"), however, amounts to no more than a plea to this Court to reweigh the evidence—a task which it cannot do. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence"); *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or substitute our own judgment for that of the ALJ."). The ALJ was perfectly entitled to consider Dr. Yordy's finding that Anderson's subjective report of hallucinations "were not evident in her behavior." (Tr. 261); *see* 20 C.F.R. §§ 404.1527(d);

15

426.927(d) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Furthermore, the ALJ was also entitled to consider the various observations that Dr. Yordy made about her memory and concentration, one of which was that "she had no difficulty in recalling her basic activities of the previous day." (Tr. 261); *see* 20 C.F.R. §§ 404.1527(d); 426.927(d) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

And with respect to the ALJ's discounting of Dr. Yordy's GAF score as a "snapshot", that logic too is easily traceable and not unreasonable. Dr. Yordy evaluated Anderson just one time, which is one of the factors the ALJ is directed to consider under 20 C.F.R. §§ 404.1527(d) and 416.927(d) when weighing the evidence. Furthermore, the Seventh Circuit Court of Appeals recently explained that though a GAF score is "useful for planning treatment" and is a "measure[] of both severity of symptoms and functional level", the score "always reflects the worse of the two" and thus "does *not* reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (emphasis added); *see Martinez v. Astrue*, No. 09 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) ("GAF scores are intended to be used to make treatment decision, . . . not as a measure of the extent of an individual's disability." (internal quoation marks and citation omitted)). "Accordingly, nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton*, 596 F.3d at 425 (citation and internal quotation marks omitted). Anderson, however, apparently believes that the ALJ should have done just that, as here *Dr. Yordy never articulated any specific functional limitations*.

16

In contrast, Dr. Horton, the state agency psychologist who reviewed Dr. Yordy's opinion together with all of the other evidence, including her daily living activities and the lack of psychological counseling or mention of psychoses in the record, did indeed translate his findings into specific functional limitations, and Dr. Neville affirmed Dr. Horton's assessment. They found Anderson's complaints only "partially credible" and concluded that notwithstanding her mental impairment, she retained the ability to perform simple, repetitive tasks. Of course, "[t]he regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise."[7] *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004); *see* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."). Consequently, the ALJ's evaluation of Dr. Yordy's opinion is supported by substantial evidence.

In sum, Anderson has failed to show that a remand is warranted based on the ALJ's consideration of Dr. Yordy's opinion. This Court simply cannot accept her plea to reweigh the evidence in the hope that it will come out in her favor this time. *Canon*, 213 F.3d at 974.

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

---

[7] While Anderson for the first time in her reply brief briefly criticizes certain findings of Dr. Horton and Dr. Neville (Reply Br. 5), she does not challenge the ALJ's consideration of these opinions (or for that matter, their findings) in her Opening Brief. Of course, arguments raised for the first time in a reply brief are deemed waived. *See Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991); *Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. Aug. 1, 2006); *Kendrick v. Barnhart*, No. 1:04CV0292DFHTAB, 2005 WL 1025777, at *12 (S.D. Ind. Apr. 18, 2005); *Swanson v. Apfel*, No. IP 99-1159-C H-G, 2000 WL 1206587, at *4 (S.D. Ind. Aug. 7, 2000).

Clerk is directed to enter a judgment in favor of the Commissioner and against Anderson.

SO ORDERED.

Enter for this 31st day of August, 2010.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge